Filed 9/29/15  P. v. Reid CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C072786 |
| v. | (Super. Ct. No. 10F03760) |
| CARLTON REID, | |
| Defendant and Appellant. | |

A jury convicted defendant Carlton Reid of first degree murder (Pen. Code, § 187[1]) and found true the allegations that he used a firearm during the crime (former § 12022.53, subd. (b)), personally and intentionally discharged the firearm (former § 12022.53, subd. (c)), and the firearm discharge caused death (former § 12022.53, subd. (d), 2010 Stats., ch. 711, § 5).  The trial court sentenced defendant to serve 25 years to life in prison for the murder in addition to a 25-year enhancement for use of a firearm.

---

[1]      Undesignated statutory references are to the Penal Code.

1

On appeal, defendant contends (1) the trial court erred in denying his motion for acquittal at the close of the prosecution's case-in-chief, (2) evidence of his prior attempted murder conviction should have been excluded because it was not sufficiently probative to show intent, (3) the trial court erred in failing to instruct sua sponte with CALCRIM No. 375 to caution the jury that evidence of his prior attempted murder was admitted only for a limited purpose, (4) the jury should not have been instructed with CALCRIM No. 371 regarding how it could view hiding evidence as consciousness of guilt, (5) CALCRIM No. 362 wrongly informed the jury it could view false statements as a confession of guilt, and (6) the cumulative effect of the claimed errors rendered his trial unfair.

We conclude the trial court properly denied defendant's motion for acquittal after sufficient evidence had been introduced to show he committed first degree murder. Evidence of defendant's prior attempted murder was properly admitted under Evidence Code section 1101, subdivision (b). As the trial court noted, the prior crime and current offense bore striking similarity. The trial court did not have a sua sponte duty to give CALCRIM No. 375 on the limited admissibility of the evidence of defendant's prior attempted murder. The trial court did not err in instructing the jury with CALCRIM Nos. 362 and 371. These pattern instructions properly informed the jury that if it found certain evidence to be true, the evidence could be used to deduce defendant's consciousness of guilt. In the absence of error, we also reject defendant's claim of cumulative prejudice. Accordingly we affirm.

FACTUAL AND PROCEDURAL HISTORY

*The Prosecution's Case-in-chief*

Sometime between midnight and 1:00 a.m. on June 5, 2010, Gregory Lewis showed up at an apartment in Natomas where his son was living. Lewis's son has the same name as his father but goes by the name Deandre. Shortly after Lewis arrived, Deandre asked his father -- who had gone outside to sit in his car -- to take him to the

2

store to buy something. Lewis told Deandre to put on his shoes. As Deandre got out of the car to get his shoes, Lewis made a phone call. Although Deandre could not hear the conversation, it was clear Lewis was angry and at one point referred to the "person who was on the phone as a 'bitch ass nigga.' " Lewis cursed loudly during the call. When Deandre returned to the car, Lewis was no longer on the phone.

Lewis drove to a 7-Eleven located on the corner of West El Camino Avenue and Northgate Boulevard. On the way, Lewis told Deandre he was going to meet someone -- referring to the person as a "bitch ass nigga." Lewis said they were to meet at the Valero gas station. However, Lewis did not drive directly to the gas station. Instead, he parked across the street from the gas station and next to a 7-Eleven. Deandre said he did not want anything from the 7-Eleven, and they waited approximately 20 minutes inside the car. Suddenly, Lewis announced: "There that bitch ass nigga go . . . right there."

A person -- later identified as defendant -- was standing at the driver's door when Lewis got out of the car. Defendant backed up and Lewis grabbed him by the wrist. Lewis pushed defendant away as he yelled, "he has a gun." Lewis was running away when Deandre saw that defendant "whipped out" a gun. Lewis had run only five steps before defendant fired five or six shots into Lewis from behind. Defendant ran away.

Deandre jumped out of the car to help his father. Using Lewis's cell phone, Deandre called 911 for help. During the call, Deandre described the shooter as Black, six feet or six feet and one inch tall, approximately 40 years old, and wearing a black shirt, black pants, and a beanie. Deandre moved the car toward his father, thinking he would drive Lewis to the hospital.

City of Sacramento Police Officer Ben Spencer responded to the dispatch call and found Lewis "in a lot of pain" and "kind of rolling around and yelling." Officer Spencer asked Lewis about his name and date of birth. Lewis answered that his name was Gregory Lewis and he was born on February 14, 1971. When Officer Spencer then asked Lewis who shot him, Lewis responded that he did not know.

3

Lewis was transported to the University of California at Davis Medical Center where he was pronounced dead at 2:17 a.m.

Dr. Stephany Fiore performed an autopsy on June 6, 2010. She described several gunshot wounds to Lewis's body. The first was a gunshot wound to the right side of the chest wall. The wound was caused by a bullet that pierced Lewis's liver, pancreas, stomach, and mesentery before it stopped under the skin of the left chest wall. The second wound was caused by a bullet that passed through the urinary bladder, hit part of the pelvic bone, and exited through the front of the body. The third bullet passed through the left buttock and left thigh. A fourth bullet hit Lewis's right calf muscle and shattered the tibia and fibula bones of the lower leg. The fifth bullet hit Lewis's left hand. Dr. Fiore also noted an impact wound on Lewis's left shoulder "that was just kind of an irregular-looking abrasion that looked like it could be an impact from possibly another projectile or some other object that struck against his skin leaving a mark." Dr. Fiore determined the cause of death was multiple gunshot wounds to the torso and extremities.

Mandeep Gill, the owner of the 7-Eleven, testified his store had surveillance video including that from two outside cameras. Gill turned over the surveillance video from the night of the shooting to the City of Sacramento Police Department. The video, which was played for the jury, showed a person walking in front of the 7-Eleven toward Lewis's parked car. Deandre testified the person walking toward the car was the same person who scuffled with and shot Lewis.

Another witness, Alvaro Rodas, confirmed the surveillance video showed the shooter in front of the 7-Eleven moving toward Lewis's car. Rodas and his wife had stopped at the 7-Eleven for a cup of coffee when he heard gunshots and saw two men in a physical struggle. Rodas saw that one of the men held a black gun, which fired several rounds so quickly Rodas believed it to be a semiautomatic weapon. Rodas watched as the shooter turned and ran away.

4

The police searched the crime scene, including Lewis's car, but were unable to locate any kind of weapon.

At some point shortly after June 5, 2010, City of Sacramento Police officers arrested defendant near the residence of Nekisha Bell. Bell is the mother of defendant's two daughters. When defendant was arrested, he had two cell phones on his person. City of Sacramento Police Detective Jimmy Vigon interviewed defendant in the early morning hours of June 8, 2010. A videotape of the interview was played for the jury. During the interview, defendant said that between midnight and 3:00 a.m. on the day of the shooting he was at Bell's downtown Sacramento residence. At 3:00 or 4:00 in the morning, defendant went to Safeway to buy food. After buying groceries, defendant returned to Bell's apartment and went to sleep. When he woke up in the morning, he watched news of the shooting on television. Defendant stated he did not know anyone by the name "Gregory Lewis."

After the interview, the police took defendant to the 7-Eleven where the shooting occurred. They instructed defendant to walk in the same place and direction as the suspect who was recorded in the surveillance video at the time of the shooting. The police officers obtained the new surveillance video, which was shown to the jury along with the original surveillance video. Detective Vigon testified, "There's a striking similarity between our suspect footage and the footage of [defendant] walking." Detective Vigon also estimated defendant is about six feet one inch tall -- within the range of height given by Deandre for the shooter.

The police reviewed phone records and discovered Lewis's cell phone called defendant's cell phone at 1:16 a.m. on June 5, 2010. A person -- rather than voicemail -- answered and the call lasted 50 seconds. When defendant's cell phone was answered, the nearest cell phone tower was located at 1959 Railroad Drive. The Railroad Drive cell phone tower was the tower closest both to Bell's residence and the 7-Eleven at which the shooting occurred.

5

At 1:24 a.m., a second call was placed from Lewis's cell phone and answered on defendant's phone. The conversation lasted 29 seconds. As with the earlier call, defendant's cell phone connected through the Railroad Drive cell phone tower. At 1:39 a.m. and 1:40 a.m., defendant's cell phone placed calls to a number different than Lewis's. Defendant's cell phone continued to connect to the Railroad Drive tower. However, a call placed from defendant's cell phone at 1:49 a.m. connected to a tower at 1514 West El Camino Avenue, which indicated the cell phone had changed locations. Defendant's cell phone placed calls at 2:33 a.m. and 3:19 a.m. and connected through a tower at 1230 N Street. The N Street tower is near Bell's residence.

Bell testified she and defendant had dated "off and on" for approximately two years after they met in 2007. They lived together for a brief time and had two girls together. While they lived together, Bell observed that defendant owned a black gun. Bell knew of an instance in which defendant went to target practice with the gun.

By June 2010, Bell had moved out and was living with her children on 17th Street in Sacramento. Defendant would sometimes visit the girls, but would not stay at Bell's apartment because she and defendant were not getting along.

At midnight on June 5, 2010, defendant called Bell. At 2:30 a.m., defendant called Bell again and said he wanted to come over to her apartment. Bell estimated defendant showed up between 2:30 a.m. and 4:00 a.m. She was certain defendant was not at her residence between 7:00 p.m. the day before the shooting and 2:30 a.m. on the day of the shooting.

On June 7 or 8, 2010, Bell consented to a search of her apartment. In a bag belonging to defendant, the police found dark brown, cargo-style sweatpants. Forensic testing indicated gunshot residue was present on the front of the pants. However, no guns were discovered in the apartment.

6

When Bell was shown the surveillance video taken at the time of the shooting, she stated the person walking toward Lewis's car was "obviously" defendant. The person in the surveillance video looked like, walked like, and was dressed like defendant.

### *Defense Evidence*

Testifying on his own behalf, defendant explained he had known Lewis only by the name of "Frisco." For a period of four to six months prior to January 5, 2010, Lewis called defendant approximately 14 times. Defendant sold marijuana and cocaine to Lewis. They had a friendly relationship and would sometimes "talk about just regular stuff." Defendant denied shooting or killing Lewis.

Defendant stated he arrived at Bell's apartment at 2:00 p.m. on June 4, 2010. He picked up his older daughter and took her to a nearby park. They returned to Bell's apartment at approximately 4:00 p.m. Bell invited defendant to stay and watch a movie with her. Defendant stayed and opened a bottle of "1800 silver." Based on his cell phone records, he estimated he left Bell's house around 7:30 p.m. Defendant testified he had been mistaken when he had previously told the police he left Bell's house around 9:30 p.m.

Sometime between 11:00 p.m. and midnight, defendant went to an apartment "between Truxel, and Garden and West El Camino" to purchase marijuana. Defendant drove six or seven minutes to Bell's house where he ended up staying for the night. His only venture out was around 2:30 a.m. to a nearby Safeway to buy cigarillos. Upon his return to Bell's house, defendant rolled marijuana into a cigarillos and smoked them outside from about 3:15 a.m. to 3:30 a.m. Defendant went back inside, crawled into bed with Bell, and slept until sometime between 7:00 a.m. and 9:00 a.m.

Defendant was arrested on June 7, 2010, after he had been drinking and smoking. Thus, defendant stated he was intoxicated when he first spoke with the police after his arrest.

7

At 1:00 a.m. or 2:00 a.m. on June 8, 2010, police officers took defendant to the 7-Eleven where the shooting occurred. The police removed defendant's handcuffs. Defendant testified Detective "Vigon told [him] if [he] didn't want . . . to be shot, the best thing to do was to listen to [Vigon]." Defendant was instructed to walk back and forth in front of the 7-Eleven. He complied with the instructions.

Defendant admitted he had been convicted of a felony involving moral turpitude in 1994 when he was 19 years old. Defendant's mother told him she had been assaulted by someone who "left a note that a .38 was waiting for her." Defendant found the assailant and shot him. The assailant survived and eventually forgave defendant for the shooting. On cross-examination, defendant acknowledged he shot that victim six times with a semiautomatic gun. However, defendant denied he had been dealing drugs at the time. Although the police found him with $2,500 on his person, defendant denied that shooting was drug related.

Defendant denied ever arguing with Lewis. According to defendant, he and Lewis both sold drugs.

Defendant admitted he had previously owned a "chrome weapon," but got rid of it when Bell objected to having it in her house. He disputed Bell's testimony that he owned a black semiautomatic gun. And defendant denied he was the person in the surveillance video taken at the time of Lewis's shooting.

Defendant stated he is five feet and ten inches tall with shoes on.

### Rebuttal Evidence

On rebuttal, the prosecution introduced the testimony of defendant's uncle, Marc Love. Love testified he made a living selling rock cocaine in April 1994. On April 16, 1994, Love and defendant's mother were in a dispute about money she owed him for rock cocaine. Love found about $110 that belonged to defendant's mother and he took it. According to Love, defendant's mother owed him almost $200. That evening, Love was hanging out at the motel where he usually sold drugs when defendant showed up. Love

8

told defendant he had not written a threatening letter to his mother. Defendant pulled out a .25-caliber semiautomatic gun and shot Love six times in the leg, arm, finger, and stomach. After the shooting, defendant "just left, walked out of the room." Love was hospitalized for seven days. As a result of the shooting, Love has a paralyzed leg and bullet in his spine.

DISCUSSION

I

***Denial of Motion for Acquittal***

Defendant asserts the trial court should have granted his motion for acquittal after the prosecution rested its case-in-chief. Specifically, defendant argues the prosecution's evidence did not show he had a premeditated intent to kill Lewis. He contends the evidence showed, at most, that he committed second degree murder. We are not persuaded.

**A.**

***Defendant's Motion***

After the prosecution completed its case-in-chief and rested its case, defendant's trial attorney moved for acquittal under section 1118.1. Defense counsel argued the evidence of identity was insufficient to convict defendant. At the same time, defense counsel made an "alternative" motion that the murder charge be reduced to voluntary manslaughter. Defense counsel argued that if the evidence of identity sufficed, the trial court should reduce the charge to voluntary manslaughter because the evidence established defendant acted in self-defense.

The trial court ruled self defense was not a basis for granting the motion. As the trial court noted, self defense was a factual question for the jury to answer. The trial court denied the alternative motion and explained: "I can't do that at this time because . . . there's no charge to reduce. He hasn't been convicted of anything. That would be a more appropriate time, at judgment and sentence."

9

**B.**

### *Standard of Review for Denial of Motion for Acquittal*

As the California Supreme Court has explained, "In ruling on a section 1118.1 motion, the trial court applies the same standard used by the appellate court ' " 'in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)' (*People v. Lynch* (2010) 50 Cal.4th 693, 759.)" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1079.)

Under section 1118.1, the "defendant need not articulate the grounds for his [or her] motion for acquittal nor is there 'any requirement that the motion be made in a particular form.' (*People v. Belton* (1979) 23 Cal.3d 516, 521 [counsel's statement 'that he did not "think that we have sufficient evidence here to convict [the defendant] of any crime. . . ." ' constituted proper form for a section 1118 motion (*ibid.*, fn. 6)].)" (*People v. Ceja* (1988) 205 Cal.App.3d 1296, 1301.)

**C.**

### *First Degree Murder*

Defendant argues the prosecution's case-in-chief lacked sufficient evidence to prove his intent to commit premeditated first degree murder.

"Murder that is perpetrated by 'willful, deliberate, and premeditated killing' is murder in the first degree. (§ 189.) 'A verdict of deliberate and premeditated first degree

10

murder requires more than a showing of intent to kill. . . . "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. . . . "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

"Generally, there are three categories of evidence sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. (*People v. Raley* [(1992)] 2 Cal.4th 870, 887; *People v. Pensinger* [(1992)] 52 Cal.3d 1210, 1237.) When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' (*People v. Pensinger, supra*, at p. 1237.) But these categories of evidence, borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26–27, 'are descriptive, not normative.' (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' (*Ibid.*)" (*People v. Cole* (2004) 33 Cal.4th 1158, 1224-1225.)

### D.

### *Sufficiency of the Evidence of Intent for First Degree Murder*

We conclude the prosecution's case-in-chief introduced sufficient evidence of premeditation to allow the jury to conclude defendant committed premeditated murder. Defendant argues no evidence of motive was shown in the prosecution's case-in-chief because no evidence had yet been introduced to support the prosecution's closing argument that Lewis was shot in a dispute over money and drugs. However, "the lack of a discernible rational motive does not preclude a conviction for first degree premeditated

11

murder." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 202.) Thus, even if the record were "barren" on the issue of motive, as defendant asserts, this would not render the evidence insufficient.

Our review of the record does yield evidence indicating defendant's motive. Shortly before the shooting, Deandre observed defendant was angry and carried on a loud argument on his cell phone. Cell phone records revealed Lewis's angry conversation was a call placed to defendant's cell phone. Lewis's anger further manifested in repeatedly calling defendant a "bitch ass nigga." Evidence of a heated argument between the victim and perpetrator in the hours before the killing can serve as evidence of motive. (*People v. Bloyd* (1987) 43 Cal.3d 333, 342-343, 348; see also *People v. Arcega* (1982) 32 Cal.3d 504, 519 [motive to commit murder demonstrated in evidence defendant was angry and frustrated by what he perceived as victim's unfair and cruel treatment of him].)

Defendant argues it would make no sense to plan a murder underneath surveillance cameras and in a well-lit area. But murder does not need to make rational or strategic sense. "[T]he law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [or her] (*People v. Jackson* (1981) 121 Cal.App.3d 862, 873, 874) or any motive, 'shallow and distorted but, to the perpetrator, genuine' may be sufficient (*People v. Smith* (1973) 33 Cal.App.3d 51, 66)." (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102.)

Next, defendant argues there was not enough time between the confrontation by Lewis and the shooting to establish premeditation. Defendant notes Lewis got out of the car so quickly defendant had to back up. And, defendant asserts Deandre thought Lewis was going to hit defendant. Defendant's argument thus characterizes the events as happening too fast to form any intent to commit murder. We reject the argument because "a cold and calculating decision to kill can be arrived at very quickly; we do not measure the necessary reflection solely by its duration." (*People v. Pensinger* (1991) 52 Cal.3d

12

1210, 1238.) Moreover, the evidence viewed in the light most favorable to the prosecution paints a different picture.

The record shows defendant arrived at the meeting with a loaded semiautomatic gun. Deandre's testimony showed that when Lewis got out of the car defendant was already "[r]ight in front of him." At the same time Lewis grabbed defendant's wrist, Lewis yelled that defendant had a gun. Thus, the evidence showed defendant not only brought a gun along, but had it at the ready. Moreover, defendant shot Lewis six times from behind after Lewis had already run five steps away. Although defendant characterizes it as "haphazard, hit-or-miss shooting," the evidence showed at least five of the bullets hit Lewis. Bullets hit Lewis's torso and extremities, piercing vital organs and shattering bones.

In *People v. Francisco* (1994) 22 Cal.App.4th 1180, the Court of Appeal upheld a premeditated murder conviction on evidence the killer shot the victim five or six times a distance of about five feet. (*Id.* at p. 1192.) "At such close range, and with the number of shots fired, the inference could be made that the shooter was intent on inflicting death." (*Ibid.*) The same reasoning applies here. At the same close range, defendant's shooting and hitting Lewis at least five times showed intent to kill.

In short, the prosecution's case-in-chief supplied sufficient evidence for a reasonable trier of fact to conclude defendant had a premeditated intent to kill Lewis.

## II

### *Admission of Evidence of Intent and Common Scheme or Plan*

Defendant argues the trial court erred in admitting, under Evidence Code section 1101, subdivision (b), the testimony of Marc Love about being shot by defendant in 1994. He contends the prior shooting was insufficiently similar to the current offense to provide evidence of intent and common scheme or plan. We disagree.

13

## A.

### *Admission of Evidence Regarding the 1994 Shooting*

Prior to trial, the prosecution filed a motion to admit defendant's prior conviction of attempted murder under Evidence Code section 1101, subdivision (b). The prosecution described the similarities of the 1994 attempted murder and current offense as follows: "In 1994 the defendant was convicted of attempted murder. The victim in the previous attempted murder indicated that . . . he and the defendant were in an argument over the sale of rock cocaine. The defendant then went to meet with [the victim] and ultimately shot him several times over the debt. The case before the court involves the exact same situation. The defendant and the victim had an issue over the sale of rock cocaine. The defendant chose to meet with victim over the issue. He brought a gun to the meeting. Ultimately using the gun to settle the issue and also shooting the victim several times with the intent to kill him." The prosecution's motion concluded both incidents demonstrate "how the defendant deals with his drug issues and shows how his intent to kill in those situation[s] is the same." Defense counsel objected to the admission of the evidence, and the trial court reserved ruling on the motion.

Love did not testify during the prosecution's case-in-chief. When the prosecution rested, defendant had elected not to testify. However, the next day, defendant changed his mind and testified on his own behalf. Before defendant testified, the prosecutor informed the court: "I'm gonna give the Court a heads-up that I believe there's no way he can testify without his previous attempted murder coming in, as well as the fact that he and the victim are both rock cocaine dealers." In response, the trial court revisited the issue regarding admissibility of Love's testimony under Evidence Code section 1101, subdivision (b), and noted "that the facts and circumstances of that [1994 attempted murder] case were eerily similar to this case, and the People were seeking to introduce it on the issue of intent." The trial court continued:

14

"And as counsel well knows, under Evidence Code section 1101(b), the [statute] requires that there be some similarity between the prior incident and the instant offense. [¶] And so, in any event, the least degree of similarity . . . is on the issue of intent. The greatest degree of similarity is required when you are trying to prove some type of common plan or scheme and modus operandi. [¶] But in this case on the issue of intent, I indicated quite clearly in chambers that these facts were so eerily similar to the instant offense that if the Defendant were to testify . . . I would be inclined to grant the People's motion to introduce that evidence."

The trial court observed that "the similarities are obvious, that the Defendant met with someone over a debt. They met. The Defendant brought a gun to the meeting, and he used the gun to settle the issue and shot the victim several times." The court concluded, "The only difference between that case and this particular case, based on the offer of proof, . . . is that the alleged victim in that case did not die."

**B.**

***Evidence of Uncharged Conduct to Prove Intent for the Current Offense***

As the California Supreme Court explained, " 'Evidence of a person's character, also known as propensity evidence, is inadmissible to prove conduct in conformity with that character trait.' (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1170.) However, under Evidence Code section 1101, subdivision (b), evidence of other crimes 'can be admitted for other relevant purposes, such as proving . . . intent,' even if it is inadmissible 'to prove the defendant had a disposition to commit similar bad acts.' (*Villatoro*, at pp. 1170–1171, fns. omitted.)" (*People v. Scott* (2015) 61 Cal.4th 363, 398 (*Scott*).)

Evidence Code section 1101 provides, in pertinent part:

"(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her

15

conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, *intent*, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Italics added.)

To be admissible under Evidence Code section 1101, subdivision (b), " 'the uncharged misconduct must be sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 23.) ' "The inference to be drawn is not that the actor is disposed to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him [or her] by the prosecution." ' (*People v. Gallego* (1990) 52 Cal.3d 115, 171.)" (*Scott*, *supra*, 61 Cal.4th at p. 398.) Under Evidence Code section 1101, subdivision (b), "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).)

Even if admissible under Evidence Code section 1101, subdivision (b), the evidence may nonetheless be excluded if its relevance is substantially outweighed by its prejudicial effect. (Evid. Code, § 352.) In deciding whether to admit or exclude evidence, the trial court has broad discretion and its "exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

## C.

### *Similarity between the Prior and Current Offenses*

We conclude the trial court did not abuse its discretion in admitting the evidence of defendant's 1994 attempted murder of Love for purposes of showing intent for the current offense. (Evid. Code, § 1101, subd. (b).) Although defendant contends the trial court admitted the uncharged conduct evidence to show intent *and* common scheme or plan, the trial court actually admitted the evidence only for the purpose of showing intent.

In both instances, defendant took a loaded gun with him to confront someone with whom he had a dispute. And each time, defendant almost immediately opened fire after little or no conversation with the victim. Both times, defendant fired his semiautomatic gun five or six times into the torso and extremities of his victims before turning and leaving. When compared with the current offense, defendant's prior attempted murder was "sufficiently similar to support the inference the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 402, quoting *People v. Robbins* (1988) 45 Cal.3d 867, 879.) Indeed, the trial court's observation that both offenses were "eerily similar" is supported by the record.

Defendant's attempt to characterize the crimes as substantially different in character is unavailing. He notes there was a physical struggle in the current case whereas no physical confrontation in 1994. And, defendant notes he knew Lewis for only a few months, in contrast to the prior victim who was his uncle. We are not persuaded. The "struggle" in the current case consisted of little more than Lewis grabbing defendant's wrist for a moment. In both cases, defendant confronted a victim he knew. Whether defendant knew one victim for a few months and another for many years, the manner in which the two shootings were committed was sufficiently similar to render the 1994 crime admissible under Evidence Code section 1101, subdivision (b).

17

### III

### *Lack of Sua Sponte Instruction with CALCRIM No. 375*

Defendant next contends the trial court erred because it did not sua sponte instruct the jury with CALCRIM No. 375. He argues CALCRIM No. 375 was necessary to instruct the jury about the purpose for which the evidence of his prior conviction could be used. We conclude the trial court was not required to give the instruction in the absence of a request.

### A.

### *CALCRIM No. 375*

CALCRIM No. 375 provides a pattern instruction with which a jury may be instructed as follows:

"The People presented evidence that the defendant committed . . . another . . . offense . . . that . . . was . . . not charged in this case. [¶] . . . [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the . . . uncharged offense . . . . Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the . . . uncharged offense . . . , you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

"A. Identity [¶] The defendant was the person who committed the offense . . . alleged in this case . . . ; or

"B. Intent [¶] The defendant acted with the intent to [commit] the offense . . . alleged . . . in this case . . . ; or

"C. Motive [¶] The defendant had a motive to commit the offense alleged in this case . . . [¶] . . . [¶]

18

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged . . . offense . . . and the charged offense . . . .

"Do not consider this evidence for any other purpose [except for the limited purpose of <insert other permitted purpose, e.g., determining the defendant's credibility>]. [¶] . . . [¶]

"If you conclude that the defendant committed the . . . uncharged offense . . . , that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of <insert charge[s]> . . . . The People must still prove . . . each charge . . . beyond a reasonable doubt."

**B.**

***Duty to Instruct on Past Criminal Conduct***

The California Supreme Court has held that, "in general, the trial court is under no duty to instruct sua sponte on the limited admissibility of evidence of past criminal conduct." (*People v. Collie* (1981) 30 Cal.3d 43, 64 (*Collie*).) More recently, the high court has reiterated that "where . . . a defendant fails to request an instruction, a trial court 'generally [has] no duty to instruct on the limited admissibility of evidence. [Citation.]' (*People v. Lang* (1989) 49 Cal.3d 991, 1020; see also Evidence Code section 355 ['When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly.' (Italics added.)].)" (*People v. Valdez* (2012) 55 Cal.4th 82, 139.)

The Supreme Court's holding that sua sponte instruction on the limited admissibility of past criminal conduct is not generally required was tempered by the recognition that "[t]here may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that sua sponte instruction would be needed to protect the defendant from his [or her] counsel's

19

inadvertence." (*Collie, supra*, 30 Cal.3d at p. 64.) Defendant in this case relies on this language in *Collie* to argue the trial court was required to instruct sua sponte with CALCRIM No. 375.

## C.

### *Evidence of Defendant's Prior Attempted Murder*

Defendant argues a limiting instruction regarding his prior attempted murder was necessary because Love's testimony "became a dominant part of the evidence against" him even though it was "highly prejudicial." We disagree.

The prosecution did not make the evidence of the defendant's prior attempted murder a part of its case-in-chief. In other words, the prosecution was sufficiently confident concerning the evidence of guilt that it rested its case without the evidence of defendant's 1994 attempted murder. Although defendant characterizes the evidence of identity to be weak, he was confidently identified by Bell and Detective Vigon as the person shown in the surveillance tape taken both at the time of the shooting and when defendant gave an exemplar of his gait after his arrest. Moreover, evidence drawn from cell phone records placed defendant's phone in the vicinity of the murder. Defendant's attempt to show he was at Bell's house during the shooting was flatly refuted by Bell. Rather than being weak, the evidence identified defendant as the person shown on the surveillance video tape at the time of the shooting.

Love's testimony constituted only a small portion of the trial. Defendant even acknowledges Love's "account" of the attempted murder "was clear and succinct." Rather than being the dominant part of the case against defendant, Love's testimony constituted rebuttal evidence introduced only after defendant himself testified about the attempted murder. This is not the "extraordinary" case for which the *Collie* court envisioned a limiting instruction to be necessary. (See 30 Cal.3d at p. 64.) Instead, Love's brief testimony on rebuttal falls under the general rule that no limiting instruction is generally necessary on the limited admissibility of evidence of past criminal conduct.

20

## IV

### *CALCRIM No. 371*

Defendant next contends the trial court erred in instructing the jury with CALCRIM No. 371 because the evidence did not warrant an inference defendant tried to hide evidence. We are not persuaded.

### A.

### *Instruction on Evidence Suggesting Consciousness of Guilt*

Over a defense objection, the trial court instructed the jury with CALCRIM No. 371 as follows: "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

As a fundamental principle, " '[t]he trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.] "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921 (*Alexander*), quoting *People v. Saddler* (1979) 24 Cal.3d 671, 681.)

"A trial court properly gives consciousness of guilt instructions where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions." (*People v. Bowman* (2011) 202 Cal.App.4th 353, 366, citing *Alexander*, *supra*, 49 Cal.4th at p. 921.) To warrant a consciousness of guilt instruction, " 'there need only be some evidence in the record that, if believed by the

jury, would sufficiently support the suggested inference.' " (*Alexander*, at p. 921, quoting *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

**B.**

***Evidence of Defendant's Consciousness of Guilt***

We reject defendant's argument no evidence suggested conduct indicating his consciousness of guilt.  The testimony of Bell established defendant owned a black semiautomatic gun while they lived together in March 2010.  Rodas, an eyewitness to the shooting, recounted the shooter used a black semiautomatic gun.  However, the police were unable to locate the gun when they searched the crime scene.  And, when the police searched Bell's residence they located a pair of defendant's pants with gunshot residue but no gun.  Based on this evidence, the jury had sufficient evidence by which they could infer defendant had a semiautomatic gun before the shooting, used that gun to shoot Lewis, and then hid the gun to conceal his commission of the murder.  Consequently, the trial court did not err in giving a consciousness of guilt instruction in the form of CALCRIM No. 371.

**V**

***CALCRIM No. 362***

Defendant argues the trial court erred in instructing the jury with CALCRIM No. 362 because it "creates an impermissible permissive presumption of guilt concerning the crimes and gang-benefit enhancement allegations, including [defendant's] mental state at the time of the offenses."  Because this case involves no gang enhancement, or even more than one crime, we reject the argument except as it relates to defendant's murder conviction.  As it relates to defendant's murder conviction, CALCRIM No. 362 properly instructed the jury about how it could view defendant's attempt to formulate an alibi for the time of the shooting.

## *Instruction by the Trial Court*

The trial court instructed the jury with CALCRIM No. 362 as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

Although defendant objected to the instruction on grounds different than the argument he presents on appeal, we consider the claim because he contends the instruction violated his substantial rights by allowing the jury to convict by misconstruing the evidentiary value of his false statements. (§§ 1176, 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [instructional error undermining the substantial rights of a criminal defendant requires no objection for appellate review].) Accordingly, we consider the claim on the merits.

## B.

## *Whether CALCRIM No. 362 Improperly Substitutes "Consciousness" for "Awareness" of Guilt*

As this court has previously noted, "CALCRIM No. 362 is the successor to CALJIC No. 2.03." (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103 (*McGowan*).) In *McGowan*, this court rejected an argument that CALCRIM No. 362 constitutes an impermissible pinpoint instruction. *McGowan* noted, "Our Supreme Court has squarely held that CALJIC No. 2.03 is not an improper 'pinpoint' instruction. (*People v. Arias* (1996) 13 Cal.4th 92, 143; *People v. Kelly* (1992) 1 Cal.4th 495, 531–532.) The court explained in *Kelly*, 'CALJIC No. 2.03 . . . does not merely pinpoint evidence the jury may consider. It tells the jury it may consider the evidence *but it is not*

*sufficient by itself to prove guilt.* [Citation.] . . . If the court tells the jury that certain evidence is not alone sufficient to convict, it must necessarily inform the jury, either expressly or impliedly, that it may at least consider the evidence. . . . There was no error.' (*Kelly, supra*, 1 Cal.4th at pp. 531–532.) [¶] Although there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362 . . . , none is sufficient to undermine our Supreme Court's approval of the language of these instructions." (*McGowan*, at pp. 1103-1104, fn. omitted.)

Defendant acknowledges *McGowan, supra,* 160 Cal.App.4th 1099 but claims he raises a challenge to CALCRIM No. 362 not addressed in our earlier decision. Specifically, he contends the phrase "aware of his guilt of the crime" in CALCRIM No. 362 is an impermissible substitute for the phrase "consciousness of guilt" previously used by CALJIC No. 2.03 and approved by the California Supreme Court in *People v. Crandell* (1988) 46 Cal.3d 833, 870 (*Crandell*), overruled on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365. CALJIC No. 2.03 instructed: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he [or she] is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination." (*People v. Page* (2008) 44 Cal.4th 1, 49, fn. 23.)

In *Crandell*, *supra,* 46 Cal.3d 833, the California Supreme Court rejected an argument CALJIC No. 2.03 impermissibly allowed a jury to "view 'consciousness of guilt' as equivalent to a confession, establishing all elements of the charged murder offenses, including premeditation and deliberation, though defendant might be conscious only of having committed some form of unlawful homicide." (46 Cal.3d at p. 871.) The *Crandell* court rejected the argument that the jury might have confused the psychological and legal meaning of "guilt," reasoning that "[a] reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than

24

'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*Id.* at p. 871.)

Defendant argues CALCRIM No. 362 impermissibly focuses on a defendant's "guilt of the crime" so consciousness of guilt essentially can be used as a confession of defendant's commission of the crime. We reach a different conclusion. A defendant's "consciousness of guilt" as used and approved for CALJIC No. 2.03 does not meaningfully differ from a defendant being "aware of his [or her] guilt of the crime" as described in CALCRIM No. 362. Both phrases describe the inference of psychological guilt that may arise from a defendant's false or misleading statements made before trial *relating to the charged crime.* Neither instruction addresses a defendant's mental state at the time of the crime.

Moreover, like CALJIC No. 2.03, CALCRIM No. 362 cautions the jury that any "evidence that the defendant made such a statement cannot prove guilt by itself." This admonition ensures that the jury does not employ evidence demonstrating consciousness of guilt as a confession of the crime. (See *Crandell*, *supra*, 46 Cal.3d at p. 870.) Considered as a whole, CALCRIM No. 362 did not mislead defendant's jury into believing it could use consciousness of guilt evidence as a confession of murder or to supply the mens rea element of murder.

## VI

### *Cumulative Prejudice*

Defendant contends the cumulative effect of errors committed at trial violated his right to due process of law under the 14th Amendment to the United States Constitution.

We have rejected all claims of error by defendant.  Consequently, there are no multiple errors to cumulate to defendant's prejudice.  (*People v. Sanders* (1995) 11 Cal.4th 475, 565; *People v. Cudjo* (1993) 6 Cal.4th 585, 630.)

DISPOSITION

The judgment is affirmed.


      HOCH     , J.


We concur:


     ROBIE     , Acting P. J.


     MAURO   , J.